**ZANESVILLE (City), Plaintiff, v. ZANESVILLE CANAL AND MANUFACTURING COMPANY, etc., et al, Defendants.**

Common Pleas Court, Muskingum County.

No. 37332.   Decided July 10, 1951.

J. Lincoln Knapp, City Solicitor, Zanesville, for plaintiff.
Neil Starkey, Charles S. Leasure, H. E. Walters, Zanesville, James Gorrell, Columbus, for defendants.

## OPINION

By CROSSLAND, J:—

We are taken back a century and a half for an insight into and a consideration of pre-Zanesville and early Zanesville history in order to embrace the factors necessary to the determination of the issues of this action, assuming the authority to do so.

The original plat of what was created by the Ohio General Assembly as the "borough of Zanesville," January 21, 1814, is dated of public record April 28, 1802, under the joint proprietorship of John McIntire and Jonathan Zane, who caused lots 8 and 16 in Square 13 each to be marked "A" and contained thereon the reference "Lots marked A appropriated for a Market House."

A ground level or first floor market subsequently began and provision therefor has continued almost uninterruptedly to date, the present building thereon containing a second floor housing various public city, school and county offices.

Plaintiff desires to discontinue the use of said lots for a market house and either to remodel the existing structure or to construct thereon a new building or buildings for public offices and a city prison and asks certain specific questions in relation thereto in section 9 of its petition for a declaratory judgment.

Defendant The Zanesville Canal and Manufacturing Com-

pany, Trustee under the will of John McIntire, deceased, answered, asking for strict proof of allegations of the petition except those expressly admitted.

Constructive service was had upon the unknown heirs, devisees, legatees, executors, administrators, next of kin and assigns of Jonathan Zane, deceased.

Leave was granted by the court to Charles S. Leasure to become a party defendant on his own behalf and on behalf of all other persons resident of Zanesville and Muskingum County, who thereupon answered, asserting two defenses, one being that said lots may be used only for a market house and, secondly, that the court is not empowered under law to render a declaratory judgment upon the issues offered by the petition and controverted by him.

Proceeding to the question of authority to entertain and render a declaratory judgment upon the questions asked by plaintiff and issue thereto, the answer is clear and positive.

"As provided in §12102-5 GC, the enumeration in §12102-2 GC, does not limit or restrict the exercise of the general powers conferred in §12102-1 GC, in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty." Coshocton Real Est. Co. v. Smith, 147 Oh St 45, 3rd syllabus.

The merit of the questions asked and issues thereunder is much less easy to determine and admits of no categorical answer within the positive knowledge of this court, but will be approached as simply and logically as possible and determined accordingly.

The deed of December 19, 1800, from Ebenezer Zane and wife to Jonathan Zone and John McIntire of the 640 acres laid out by them in town lots recites payment therefor of $100.00.

The plat itself was prepared, filed and recorded by the then future original proprietors of Zanesville, pursuant to and in accordance with an act of the General Assembly of the Territory of the United States, north-west of the River Ohio, to provide for the recording of Town plats, approved December 6, 1800, and effective May 1, 1801. Its pertinent provisions follow:

"Sec. 3. And be it further enacted, That whenever any town shall hereafter be laid out within this territory, the proprietor or proprietors of such town, shall cause a map or plat thereof to be recorded in manner aforesaid, before any lot or lots therein be offered for sale; and if any person or persons shall sell, or offer for sale, any lot or lots within such town, before the plat thereof be recorded as aforesaid, such person or persons shall forfeit and pay the sum of one hundred dollars, for every lot so sold.

Sec. 4. And be it further enacted, That such maps or plats as are required by this law to be recorded, shall particularly set forth and describe, all the public ground within such town, by its boundaries, courses and extent, and whether it be intended for streets, alleys, commons or other public uses, and all the lots intended for sale by progressive numbers and their specific length and width, and the map so made and acknowledged before a justice of the peace, or justice of the common pleas of the proper county where the town lies, or before a judge of the general court, or being made and proved agreeably to the provisions contained in the second section of this act, and certified under the hand and seal of the judge or justice taking such acknowledgment or probate and recorded, shall be deemed a sufficient conveyance to vest the fee of such parcels of ground as are therein expressed, named or intended to be for public uses, in the county in which such town lies, in trust to and for the uses and purposes therein named, expressed or intended, and for no other use or purpose whatever.

Sec. 5. And be it further enacted, That if any proprietor or proprietors, their agent or attorney, shall cause any map of a town to be recorded as aforesaid, which does not set forth and describe, in manner aforesaid, all and every parcel of ground which has been or shall be promised or set apart by the original articles of sale, for public uses and other lots, such person or persons shall forfeit and pay double the value of the ground so promised and not set forth in the map; three fourth parts thereof to the use of the county wherein such town lies, for the express purpose of purchasing ground within and for the use of such town, in lieu of that which was so promised, and the other fourth part to the use of the person prosecuting."

The first Act, to provide for the recording of town plats, by the Ohio General Assembly, was dated February 14, 1805, effective June 1, 1805, and was virtually a re-enactment of the foregoing.

Thereafter, said Act of 1805 was repealed and a new, changed and much more extensive law was enacted and became effective June 1, 1831, in replacement, and included provisions similar to those above set forth, excepting that in Section 6 thereof it was provided that:

"such map or plat so recorded, shall be deemed a sufficient conveyance to vest the fee of the parcel or parcels of land therein set forth and described, or intended to be for streets, alleys, ways, commons or other public uses, in such city or town corporate, to be held in the corporate name thereof, in trust

to, and for the uses and purposes so set forth and expressed or intended."

The foregoing portion of section 6 of the Act of 1831 is restated in present §3585 (73 v. 60) GC which reads as follows:

"Sec. 3585 GC. Fee shall vest in municipality. The map or plat so recorded shall thereupon be a sufficient conveyance to vest in the municipal corporation the fee of the parcel or parcels of land designated or intended for streets, alleys, ways, commons, or other public uses, to be held in the corporate name in trust to and for the uses and purposes in the instrument set forth and expressed, designated, or intended."

Subsequent to the aforesaid platting April 28, 1802, the General Assembly of the State of Ohio enacted an Act. effective March 1, 1804, to establish the County of Muskingum, making Zanesville its temporary seat of justice.

Effective as of April 1, 1814, an Act to incorporate the town of Zanesville was enacted by the Ohio General Assembly, January 21, 1814, the first section of which reads as follows:

"Sec. 1. Be it enacted by the General Assembly of the State of Ohio, That all that part of the town of Zanesville, in the County of Muskingum, included in the original plat thereof, and now on record in the County of Washington, together with all the additional lots since added thereto on the east side of the river Muskingum, and now on record in the County of Muskingum, be, and the same is hereby erected into a town corporate, and shall henceforth be known and distinguished by the name of the 'borough of Zanesville'; subject however to such alterations and regulations as the legislature may from time to time think proper to make."

The opening sentence of the fifth section of said Act reads:

"Sec. 5. Be it further enacted, That the said mayor, recorder and trustees and their successors in office, shall be capable to receive, acquire, hold and convey any estate real or personal for the use of said corporation:"

Three early Ohio Supreme Court cases deal with comparable situations and arrest attention and consideration with respect to the instant case. There are many more but this court believes that these particular three contain the substance of early Ohio Supreme Court expression more or less contemporaneous with the subject matter therein dealt with and herein presented. Page references are to page bottom numbers.

In the case of **Brown v. Manning et al, 6 O. 295,** decided in the December Term, 1834, the first paragraph of the opinion of the court on page 300 reads as follows:

"The subject of appropriations for public purposes has of late been frequently under the consideration of courts in our

country; and it is now well settled that where lands are dedicated by the owner to any lawful use, public, pious, or charitable, and are used for the object, and in the manner contemplated by the owner, it inures as a grant. The existence of a grantee is not essential to the validity of such dedication, nor is any particular form of words necessary to give it effect. If accepted and used by the public in the manner intended, it works an estoppel in pais, precluding the donor, and all claiming in his right, from asserting any ownership inconsistent with such use."

The case of **City of Cincinnati v. Hamilton County, 7 O. 82,** decided in December Term, 1835, concerned occupation and use by Hamilton County of land in Cincinnati which was dedicated by the original proprietors of Cincinnati for public uses. The city sought to eject the county after the county court house burned down. Cincinnati was laid out in 1789. On pages 90 and 91 of its opinion the court discusses the Act of December 6, 1800, hereinbefore referred to, in the following language:

"On December 6, 1800, a law was enacted by the territorial legislature, 1 Chase. Stat. 201, requiring the proprietors of any town that had theretofore been, or that thereafter should be laid out within the territory, to cause a true and accurate map or plat of such town, to be recorded in the recorder's office of the proper county—and the same law provides that the fee of any and all parcels of ground **designated** or **intended** to be for public uses, should, by such recording be vested 'in the county, in which such town is, in trust to and for the uses and purposes therein **named, expressed,** or **intended,** and for no other use or purpose whatever.' Upon the recording of the plat of Cincinnati, the fee of the lots in controversy, was vested in the County of Hamilton—not to be disposed of in such manner as the authorities of the county might deem most expedient and proper, but in trust for the uses 'intended' by the proprietors of the town."

In the same term of court the case of **Le Clercq et al. v. Trustees of Gallipolis, 7 O. 214** was decided. This case concerned a public square or "La Place," as it was designated originally and which it was expressly stipulated "shall remain free, and never be alienated or obstructed on the bank of the river by any kind of buildings." The court held that: "The acts of the commissioners, valuing the lots adjoining 'La Place' at a higher price, 'because it was forever inalienable and to be kept open' thus furnishing evidence of the object," warranted a perpetual injunction against the City of Gallipolis from diverting La Place from its original use as a public

square, for which the ground had been used for nearly forty years, "except so far as the court house and market house have interrupted this occupation."

The court's opinion was written by Justice Lane, who also wrote the opinion in Brown v. Manning, supra, both of which are excellent and scholarly treatises of the law.

"Among the inestimable advantages secured by the constitution of Ohio to its citizens, is the inviolability of private property. The power of divesting the owner of his rights is limited by Section 4 of Article 7, to those cases where it is necessary for the public welfare." (bottom page 217.)

In referring to trusts "in public corporations instituted for political or civil purposes, as cities or towns," Justice Lane comments:

"If the object of its creation can be attained, the court of chancery will enforce its execution. Where circumstances are so changed, that the direction of the donor prescribing the use, can not be literally carried into effect, the legislature or the court, in those cases where general intention can be effected, may lawfully, in some cases, enforce its execution as nearly as circumstances admit, by the application of the doctrine of cy pres."

What is the "sense" and effect of all of the foregoing and what can be concluded and determined therefrom?

Having shortly before invested $100.00 in 640 acres of military lands for a town site, McIntire and Zane presumably complied fully with the territorial law in effect April 28, 1802, with reference to town plats. The law contemplated some public ground and deemed the map or plat "a sufficient conveyance to vest the fee of such parcels of ground as are therein expressed, named or intended, for public uses, in the county in which such town lies, in trust to and for the uses and purposes therein named, expressed or intended and for no other use or purpose whatever."

Section 5 of the Plat Act clearly indicates that town proprietors were required to reserve some parcels for public use before they could sell others and prescribed a penalty of double value for failure to "set forth and describe, in manner aforesaid, all and every parcel of ground which has been or shall be promised or set apart by the original articles of sale, for public use."

While Zane and McIntire presumably and apparently complied fully with the existing territorial law in platting original Zanesville, including the appropriation of two certain lots "for a Market House," does it necessarily follow that said lots now remain forever impressed with a trust "for no other

use or purpose whatever," if the circumstances and words of dedication are considered less rigidly binding presently?

The judicial authority of that era, while said law was still operative, seemingly admits of no alternative view, unless "circumstances are so changed, that the direction of the donor prescribing the use, can not be literally carried into effect," in which event it is conceded that "the legislature or the court, in those cases where general intention can be effected, may lawfully, in some cases, enforce its execution as nearly as circumstances admit, by the application of the doctrine of cy pres."

What can and should be said as to what may or may not be done, at this date, more than one hundred years after the legislative enactments and judicial pronouncements above referred to, which themselves were some years after the statutory dedication by the original proprietors of Zanesville?

On the one hand, plain, understandable and unambiguous language should not be given a tortured or illogical construction. At the same time, should considerations engaged and determinations made under the circumstances and contemplation and in the light of the events of one and one-half centuries ago continue as the irrevocable basis for the ensuing 150 years, without any latitude whatever for the exercise of present or future judgment by responsible elective public officials regarding present and future public needs, interest or welfare?

In a government of law, witnessing tremendous and decided evolutionary social, economic and political changes, must and shall the law itself, through which alone government performs its operations and discharges its services, become unwilling or unable to recognize or admit new centuries, new populations, new conditions and new needs, when called upon to judge new questions?

To the mind and opinion of this court, the law is a living force, intended to serve living needs, drawing through its roots upon the fertility and greatness of the past, whose principles are ever immutable, but whose principles it is the aim and endeavor of government by law ever to energize and keep virile in their application and effect.

With the foregoing conception of duty and responsibility incumbent upon the court, not to resign itself to a taciturn complacency of its own inadequacy, an attitude obviously also held by the municipal authority of the City of Zanesville, let us consider as of now the merit of plaintiff's inquiry.

Lots appropriated in 1802 for a Market House in Zanesville, if no longer nor hereafter deemed necessary therefor by re-

sponsible municipal authority, acting under and pursuant to law, may be appropriated by those now or hereafter charged with the responsibility of municipal management and operation in the lawful conduct of its affairs, for use for public city offices and a city prison, in lieu of continued use for a Market House, under §3677 CG, which provides that:

"Municipal Corporations shall have special power to appropriate, enter upon and hold real estate within their corporate limits," paragraphs 3 and 4 stating purposes for which such power shall be exercised as being:

"3. For public halls and offices, and for all buildings and structures required for the use of any department;

"4. For prisons, workhouses, houses of refuge and correction, and farm schools:"

Secs. 3679 and 3680 GC prescribe the requirement of appropriate resolution and advertisement, with successive steps thereafter applicable in the circumstances, so as to unquestionably establish the fee in the City of Zanesville, with the divestment of any possible longer fee in Muskingum County, which may have resulted under former law, and, in an abundance of caution, with service of notice upon each of the two original defendants herein, but without financial obligation owing or compensation assessable or determinable to or in favor of any person or party, concluding with the judgment of this court confirming such proceedings in accordance with the decree herein and in conformity with the requirement of the applicable provisions of said chapter and statutes.

"Under the power of eminent domain public grounds, parks, squares, commons, landings, and similar public property, may be appropriated to another public use, even though the property has been dedicated to a purpose with which the new use is inconsistent." 15 O. Jur. 757, Sec. 55.

"Public streets, squares, landings and grounds are held in trust for the public, and being so held they are, for the use for which they were dedicated or acquired and subject to the property rights of the abutting owners, under the absolute control of the legislative power of the state." L. & N. R. R. Co. v. City of Cincinnati, 76 Oh St 481, 1st sentence, 1st syllabus. (See also second paragraph page 507.)

The above language was restated and reaffirmed in City of Galion v. City of Galion, 154 Oh St 503, top of page 508, decided February 7, 1951.

This court considers and holds that thereupon said premises will be held by plaintiff in fee simple title, not absolute, but in trust for public use in accordance with the municipal appropriation, without accountability otherwise than for its

continued public use for the purposes of the municipal appropriation.

As heretofore expressed, this court does not claim or seek to arrogate to itself on the subject matter of this action unreserved finality of conviction or assurance of judicial omniscience, but welcomes a review of what it believes involves a question of general public interest.

In brief recapitulation, otherwise stated than before, the court takes judicial notice of the fact that during past years public market houses as shopping centers where country producer-sellers and city or town consumer-buyers met periodically and transacted their selling and buying requirements weekly or semi-weekly, as was the custom for long years long ago, have virtually ceased to exist as even the semblance of what they once were. New and improved highways, new and improved modes of transportation, new and improved marketing and super-marketing, sales, distribution and all factors of producer sales and consumer purchases have brought about a complete metamorphosis in the business of foods, flowers, et cetera. Would a downtown block be dedicated in a 1951 city plat any where in Ohio for the single restricted unalterable use and purpose of a market house: Or exacted as a promise and required of the dedicators?

Counsel for plaintiff may prepare and submit to counsel for defendants an entry in accordance with the foregoing findings and conclusion for consideration of approval and then to the Court for its approval for filing, with exceptions.